DICKINSON, Presiding Justice, for the Court:
¶ 1. In 1992, Jeffrey Davis was convicted of murder and sentenced to death.[1] After we affirmed his conviction and sentence on direct appeal, he filed a petition for post-conviction relief, claiming, among other things, that he was denied effective assistance of counsel at the sentencing phase of his trial. Based on the evidence produced by Davis’s new counsel-that was available to, but never discovered or produced by, his trial counsel-we reverse the trial court’s denial of post-conviction relief and remand for a new sentencing trial.
BACKGROUND FACTS AND PROCEEDINGS
¶ 2. In 1991, after turning himself over to the Greene County Sheriffs Office for murdering his friend Linda Hillman, Davis waived his Miranda[2] rights, cooperated with police, and was indicted for capital murder. The trial court appointed George Shaddock to represent and defend Davis at trial.
*467 ¶ 3. After learning the State would seek the death penalty, Shaddock had only two meetings with Davis, the second of which took place the day before trial. Almost all of Shaddock’s interviews of mitigation witnesses and preparation for the penalty phase of Davis’s trial took place the day before trial. Shaddock made no attempt to obtain and review Davis’s medical, school, or military records; he never interviewed any of the prison personnel where Davis was incarcerated prior to trial; and he did not produce any evidence that described the alleged abuse Davis had suffered as a child, at the hands of his father.
The Sentencing Hearing
¶ 4. After Davis was found guilty of capital murder, the matter proceeded to a sentencing hearing at which Shaddock made no opening statement. The total, combined testimony of mitigation witnesses consumed less than fifteen pages of transcript.
¶ 5. One of those witnesses — Davis’s mother — met with Shaddock only twice. At the first meeting, they met for an hour and, according to Davis’s mother, talked about “a lot of nothing.” At their second meeting, which took place the day before sentencing, Shaddock simply told her to “get up there and beg for [your] son’s life.” Shaddock called Davis’s sister, with whom he met once for ten minutes the day before sentencing.
¶ 6. Shortly after Davis was convicted, Shaddock asked him for the names of any other witnesses he (Davis) could have at the sentencing hearing. Davis mentioned his landlord, Clayton Evans, who appeared and testified with no preparation whatsoever. Evans’s testimony concerning Davis amounted to a single page of the transcript. At the evidentiary hearing, Shad-dock had no notes and no recollection of these events.
¶ 7. As his final witness, Shaddock called an investigator with the Mississippi Highway Patrol to testify to Davis’s criminal record. The penalty phase closed, and the jury sentenced Davis to death.
¶ 8. After this court affirmed Davis’s conviction and sentence on direct appeal,[3] Davis filed a petition for post-conviction relief in this Court.[4] In his petition, Davis raised sixteen issues — including: (1) Davis’s claim that his trial counsel was ineffective for failure to properly investigate, prepare, and present mitigation evidence at sentencing; and (2) that Davis’s counsel was ineffective for failing to communicate a plea bargain tendered by the State. We found that those two claims had sufficient merit to warrant an eviden-tiary hearing and remanded the case to the circuit court. We denied the petition on the remaining issues.
The Evidentiary Hearing
¶ 9. Davis obtained new counsel to represent him at the post-conviction proceedings. His counsel called eleven witnesses, many of whom clearly had been available to Shaddock.

Betty Cochran

¶ 10. Betty Cochran testified to her long relationship with the Davis family. Cochran worked as a nurse for Davis’s family doctor and lived in the same trailer park as Davis’s family. She became close friends with Davis’s mother, and their children grew up together. As Davis grew older and moved out on his own, Cochran lived in his neighborhood and talked to Davis on a daily basis. Davis had keys to Cochran’s home, and Davis would house-sit when she was out of town for work. Cochran also testified that Davis helped and *468 ran errands for everyone in the neighborhood, including a crippled, elderly widow who could not leave her house.
¶ 11. When Shaddock first met with Davis’s mother, Cochran was present and had been introduced to Shaddock as a lifelong friend of Davis’s family. But after the introduction, Shaddock never interviewed Cochran or asked about her again. Cochran was present at the trial, and even passed Shaddock in the halls of the courthouse. Still, Cochran was never asked to testify on Davis’s behalf.
Linda Davis[5]
¶ 12. Linda Davis, who worked as the office deputy at the George County Sheriffs Department where Davis was held before trial, saw him every day. She testified that Davis attained the status of trusty and “went around doing errands and all for the jail during the day.” She stated that Davis never caused trouble while he was there, characterizing him as “a very nice and polite fellow.”
¶ 13. She also testified that Davis often was allowed to go outside the confines of the jail — unescorted—in civilian clothes, and that he was allowed to drive patrol cars around the corner, again unescorted, to a facility where he would change the oil in the cars. She stated that Davis and his family were allowed to take family pictures in the courthouse in front of the Christmas tree.
¶ 14. According to Davis, Shaddock never contacted her about Davis’s conduct while incarcerated, or about testifying on Davis’s behalf. She stated that, if asked, she would have testified.

Cynthia Mizell

¶ 15. Davis’s sister, Cynthia Mizell, testified that their father was an abusive alcoholic and that “[i]t was a turmoil childhood.” She further testified:
There were a lot of things that went on in our household that people that don’t understand, that haven’t been raised in a household like that, we had a lot of situations to where we would be at home and my father was bad to not come home ... and you never knew at the time when he came in, what kind of mood he was going to be in. So we all tried to tip toe around, and just be as quiet as we could.
¶ 16. Mizell went on to describe a night when her father began strangling their mother. Davis — at age twelve — tried to save his mother by jumping on his father’s back, but his father threw him off, so he ran to a neighbor’s house to get help. When he returned, his father threatened to kill him and forced him to sleep outside. Cynthia testified that this “happened regularly at least every weekend.”

Other Witnesses

¶ 17. In addition to Davis’s mother, sister, and Betty Cochran, post-conviction counsel called seven other witnesses: a deacon at Davis’s church; the husband of Davis’s Sunday-school teacher; three of Davis’s past employers; Davis’s ex-brother-in-law; and one of Davis’s long-time neighbors. These witnesses testified that Davis was always willing to volunteer around his community, including church events, running errands for an elderly widow, and helping neighbors with house work. Like Betty Cochran, Davis’s neighbor Darryl Cooley often had Davis house-sit while Cooley was out of town. All testified to his nonviolent behavior, good work ethic, and that, had Shaddock asked them to testify at sentencing, they would have.
¶ 18. At the close of the hearing, the circuit denied Davis’s petition for post- *469 conviction relief, holding that Davis’s counsel was not ineffective. Davis now appeals the circuit court’s decision, raising the following issues: (1) Shaddock’s failure to investigate, prepare, and present mitigation evidence amounted to ineffective assistance of counsel; (2) Shaddock’s failure to communicate a plea bargain to Davis amounted to ineffective assistance of counsel; and (3) the circuit judge’s refusal to allow an addictionologist to testify at the evidentiary hearing constitutes reversible error. While we affirm the circuit court as to the plea-bargain issue, we hold that Shaddock’s performance was deficient for failing to properly investigate, prepare, and present mitigation evidence and that such deficiency was prejudicial. We therefore reverse Davis’s death sentence and remand for resentencing. Because we reverse Davis’s sentence regardless of the addictionologist’s testimony, we need not reach that issue.
ANALYSIS
¶ 19. It is settled law that we “will not disturb the factual findings of a trial court in denying [a] petition [for post-conviction collateral relief] unless such findings are clearly erroneous.... ‘However, where questions of law are raised the applicable standard of review is de novo.’ ”[6]
1. Davis’s counsel failed to conduct an independent investigation for mitigation evidence, and he failed to prepare properly for the sentencing phase of the trial.
¶ 20. A defendant alleging ineffective assistance of counsel bears the burden of showing “that counsel’s representation fell below an objective standard of reasonableness.... The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.”[7] Another benchmark for determining whether counsel’s representation was unconstitutionally deficient, is “[w]hether counsel’s conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.”[8]
¶ 21. It is correct that “[j]udicial scrutiny of counsel’s performance must be highly deferential ...,”[9] and courts have rightly “upheld decisions not to put on mitigating evidence where the decision resulted from a sound trial strategy.”[10] Counsel often fail to call witnesses because they conclude the witness will do more harm than good. But no trial strategy was involved here. It takes no deep legal analysis to conclude that an attorney who never seeks out or interviews important ■witnesses and who fails to request vital information was not engaging in trial strategy-
¶ 22. Shaddock had a duty to conduct a reasonable, independent investigation to seek out mitigation witnesses, facts, and evidence for the sentencing phase of Davis’s trial.[11] Instead, he conducted no independent investigation, relying on witnesses whom Davis suggested, and whom Shaddock failed to properly prepare.
¶ 23. Shaddock blames his failure to conduct an independent investigation on *470 his incorrect understanding that Davis was not from the local community. In fact, except for his service in the military, Davis had lived in the local community his entire life. Bearing in mind the standards of review stated above, we now proceed to apply the law to these facts.
¶ 24. In evaluating claims of ineffective assistance of counsel in death-penalty cases, we are bound by federal law[12] and particularly, by the United States Constitution and cases decided by the United States Supreme Court. The Constitution guarantees every criminal defendant effective assistance of counsel.[13] The line between effective and ineffective assistance of counsel is not always clear. But the United States Supreme Court — through its precedent — has established certain principles that must guide our decisions. We begin with a case with facts similar to those before us today.
Williams v. Taylor[14]
¶ 25. During the sentencing phase in Williams v. Taylor, the defendant offered the testimony of his mother, two neighbors, and a psychiatrist[15] (very similar to the evidence presented by Shaddock). The witnesses primarily discussed how the defendant was not prone to violence and was well-behaved as a boy. In post-conviction proceedings, however, evidence was discovered that the defendant had had an abusive childhood, had mental issues (although fit for trial and capital punishment), had thrived in the structured environment of prison, and was thought not to pose a future danger to society.[16] This substantial mitigation evidence failed to impress the Supreme Court of Virginia, which held that it was merely cumulative to what the jury had heard at sentencing.[17]
¶ 26. On appeal, the United States Supreme Court reversed, holding that defense counsel’s failure to discover and introduce evidence of the defendant’s abusive childhood or testimony from prison officials that defendant coped well in a structured environment as well as counsel’s failure to properly prepare for sentencing, could not be considered tactical.[18]
Wiggins v. Smith[19]
¶ 27. In Wiggins v. Smith, defense counsel failed to produce evidence of the defendant’s life history or family background.[20] After the defendant’s death sentence was affirmed on direct appeal, post-conviction counsel discovered evidence that Wiggins had suffered physical and sexual abuse as a child.[21] Wiggins’s trial counsel claimed they knew of Wiggins’s abusive past, but decided — as a matter of strategy — not to present it.[22]
¶ 28. The Maryland Court of Appeals found that Wiggins’s trial counsel made a tactical decision to concentrate on the guilt aspect instead of Wiggins’s life history.[23] *471 The United States Supreme Court reversed the death sentence, holding that counsel’s failure to uncover and present the mitigating evidence on Wiggins’s behalf could not be justified as a tactical decision. The Court stated: “Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.”[24] Stated another way, there is no strategy involved in neglecting to investigate and failing to ask questions of potential witnesses.
¶ 29. In both Williams and Wiggins, the United States Supreme Court found that counsel’s failure to discover and introduce evidence of child abuse and the ability to cope in the structured environment of prison amounted to deficient performance. The Court further held that, had such evidence been entered, there was “a reasonable probability that at least one juror would have struck a different balance.”[25] Therefore, the deficient performance was prejudicial and required reversal of the death penalty. Numerous other courts have reached the same conclusion.[26]
¶ 30. Despite the clear law announced in Williams and Wiggins, the State and the dissent argue that the mitigation evidence Shaddock failed to uncover and produce was cumulative and therefore not prejudicial. Both the State and the dissent are simply incorrect.

Skipper v. South Carolina

¶ 31. The dissent cites — out of context — a snippet from the United States Supreme Court’s decision in Skipper v. South Carolina,[27] while completely ignoring its holding. In fact, the decision in Skipper leads to the inescapable conclusion that Davis’s death sentence must be reversed.
¶ 32. In Skipper, at his sentencing hearing, the defendant introduced testimony from his ex-wife, mother, sister, and grandmother concerning the circumstances of his childhood.[28] He then attempted to introduce the testimony of prison officials that he was well-behaved in prison, had a record of good conduct, and adjusted well to prison life. The trial court — characterizing the testimony as cumulative — refused to allow Skipper to call the witnesses.[29] In reversing the trial court, the United States Supreme Court stated that
characterizing the excluded evidence as cumulative and its exclusion as harmless is implausible on the facts before us. The evidence petitioner was allowed to *472 present on the issue of his conduct in jail was the sort of evidence that a jury naturally would tend to discount as self-serving. The testimony of a more disinterested witness — and, in particular of jailers who would have had no particular reason to be favorably predisposed toward one of their charyees— would quite naturally be yiven much yreater weiyht by the jury.[30]
¶ 33. The portion of the decision emphasized above obviously is necessary to an understanding of the importance of the case. Yet the dissent omits this critical language and surgically removes the phrase: “was the sort of evidence that a jury naturally would tend to discount as self-serving ...,” in an attempt to support the incorrect proposition that an attorney’s failure to present mitigation evidence from relatives can never be prejudicial. The import of Skipper is not about the testimony of relatives, but rather is about the testimony of “jailers” who observed a death-penalty defendant’s conduct while incarcerated.
¶ 34. The purpose of the phrase about the testimony of relatives was to contrast testimony from jailors who, according to the Supreme Court, “would have had.no particular reason to be favorably predisposed toward one of their charyees ” and whose testimony “would quite naturally be yiven much yreater weiyht by the jury.”[31] And nowhere did the Skipper Court even imply that failure to obtain testimony from a family member could not found to be prejudicial.
¶35. Skipper clearly stands for the proposition that testimony from disinterested prison personnel about an inmate’s conduct is highly probative. In fact, the Skipper Court specifically held that the trial judge’s refusal to allow such testimony (even though it was “cumulative”) was reversible error.
¶ 36. Applying Skipper to the case before us, we must conclude that Shaddock’s representation was ineffective. Linda Davis — the deputy sheriff who worked at the jail where Davis was incarcerated, and who had observed him on a daily basis— could have, and would have (had she been asked), testified that she had observed Davis’s good conduct in prison, and that he had achieved trusty status and had adjusted well to the prison environment. And, even though the Court in Skipper — a case that should be familiar to any counsel representing a defendant in a death-penalty case — reversed the death penalty because defense counsel failed to uncover and produce the “testimony ... of jailers,” Shad-dock never interviewed Linda Davis or any of Davis’s other jailers, and he never sought to produce any evidence of Davis’s conduct while incarcerated.
¶ 37. Furthermore, neither Linda Davis’s testimony concerning Davis’s conduct while incarcerated, nor Mizell’s testimony about his abuse, was cumulative of any evidence produced at the sentencing phase of Davis’s trial. No witness testified about his history of child abuse, his adjustment to incarceration, or his status as a trusty. We emphasize that entirely new, unheard testimony is not cumulative.
¶ 38. Davis also claims that the circuit court erred at the evidentiary hearing by not preventing addictionologist Dr. James J. Kramer from testifying. But, because we reverse and remand Davis’s death sentence regardless of this testimony, we need not reach this issue. Davis also claims that Shaddock was ineffective for failing to discover and produce his medical and *473 school records. But, because those records are not in the record before us, and because we reverse on other grounds, we decline to address the issue.
2. Because Davis has failed to show that the State tendered a plea offer, we cannot hold that his counsel was deficient for failure to communicate the offer to Davis.
¶ 39. Davis also argues that his counsel was ineffective for failure to communicate a plea offer tendered by the State the day before Davis’s trial. But the affidavits submitted with Davis’s post-conviction-relief petition contain conflicting accounts regarding whether the State actually tendered a plea offer. Former District Attorney Dale Harkey stated in an affidavit:
Prior to the trial ..., I tendered to the Defendant, Jeffrey K. Davis, a plea offer whereby in exchange for a plea of guilty to Murder and Armed Robbery, the State of Mississippi would recommend a sentence of Life imprisonment for Murder, and ten (10) or (20) years imprisonment, consecutive, for Armed Robbery. This offer was not reduced to writing, but communicated to the attorney of record for Jeffrey K. Davis.
Shaddock states by affidavit that he “was not offered a plea bargain by the State of Mississippi prior to his conviction.”
¶ 40. The circuit court summarized the testimony produced at the post-conviction evidentiary hearing:
[Davis] testified that he recalled an offer being relayed by Shaddock from [District Attorney Dale Harkey] to plead and receive a sentence of twenty years day for day on each count to run consecutively; it was not an offer he was willing to accept.[32] Shaddock remembers receiving an offer of what he thinks may have been twenty and twenty. Harkey testified that he does not recall specifically, but he thinks he may have made an overture to Shaddock about the possibility of a plea.[33] Harkey’s testimony made it clear that there was no true plea offer on the table. There was basically discussion about the possibility of talking about a plea offer. He does recall there being a discussion along the lines of if there was going to be a plea offer it may be in the realm of life plus twenty years.
¶ 41. We affirm the circuit court’s finding that trial counsel’s performance was not deficient for failure to communicate a plea offer because Davis has failed to prove that the State tendered a plea offer. The evidence presented reveals no more than pretrial posturing by the State and counsel for the defendant. The circuit court correctly concluded that no enforceable plea offer was made and that the preliminary conversations were merely a “discussion about the possibility of talking about a plea offer.” Given the contradictory accounts in the record and the lack of a written agreement, we likewise cannot conclude that a plea offer existed. And, even assuming that a plea offer existed, we cannot ascertain its terms. Therefore, we conclude that Davis has not shown his counsel’s performance fell below an objective standard of reasonableness in this regard. We affirm the circuit court’s conclusion that “[t]he evidence before the Court does not show there was a plea offer to discuss with the plaintiff or that he was *474 prejudiced by the actions of his attorney. This issue is without merit.”
CONCLUSION
¶42. Davis’s counsel failed to conduct an independent investigation which would have revealed substantial mitigating evidence. And as the United States Supreme Court held in Wiggins, had such evidence been entered, there was “a reasonable probability that at least one juror would have struck a different balance.”[34]
¶ 43. We therefore hold that Shad-dock’s failure to conduct an independent investigation, and his failure to discover and present readily-available mitigation evidence of Davis’s abuse as a child, and his conduct while incarcerated, amounted to ineffective assistance of counsel. Therefore, we reverse the judgment of the Greene County Circuit Court denying post-conviction relief and remand the ease to the trial court to vacate Davis’s death sentence and hold a new trial on sentencing.
¶ 44. REVERSED AND REMANDED.
WALLER, C.J., CARLSON, P.J., RANDOLPH, LAMAR, KITCHENS AND KING, JJ., CONCUR. CHANDLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PIERCE, J.

. Davis v. State, 684 So.2d 643 (Miss.1996).

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Davis v. State, 684 So.2d 643 (Miss.1996).

. Davis v. State, 743 So.2d 326 (Miss.1999).

. Linda Davis is not related to Jeffrey Davis.

. Rowland v. State, 42 So.3d 503, 506 (Miss.2010) (citations omitted) (quoting Lambert v. State, 941 So.2d 804, 807 (Miss.2006)).

. Strickland v. Washington, 466 U.S. 668, 688, 691, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984).

. Id. at 686, 104 S.Ct. 2052.

. Id. at 689, 104 S.Ct. 2052.

. Havard v. State, 988 So.2d 322, 334 (Miss.2008).

. Strickland, 466 U.S. at 691, 104 S.Ct. 2052.

. See id. at 684-87, 104 S.Ct. 2052; Stringer v. State, 454 So.2d 468, 476-77 (Miss.1984).

. Strickland, 466 U.S. at 686, 104 S.Ct. 2052.

. Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

. Id. at 369, 120 S.Ct. 1495.

. Id. at 370-71, 120 S.Ct. 1495.

. Id. at 371, 120 S.Ct. 1495.

. Id. at 395-99, 120 S.Ct. 1495.

. Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

. Wiggins, 539 U.S. at 516, 123 S.Ct. 2527.

. Id. at 516, 123 S.Ct. 2527.

. Id. at 517, 123 S.Ct. 2527.

. Id. at 518, 123 S.Ct. 2527.

. Id. at 522, 528, 123 S.Ct. 2527.

. Wiggins, 539 U.S. at 537, 123 S.Ct. 2527.

. Boyde v. Brown, 404 F.3d 1159 (9th Cir.2005) (death sentence reversed for counsel’s failure to develop and present mitigating evidence of child abuse); Lewis v. Dretke, 355 F.3d 364 (5th Cir.2003) (petitioner’s death sentence reversed for counsel’s failure “to investigate mitigating evidence of his abusive childhood.”); Douglas v. Woodford, 316 F.3d 1079 (9th Cir.2003); Karis v. Calderon, 283 F.3d 1117 (9th Cir.2002); Silva v. Woodford, 279 F.3d 825 (9th Cir.2002); Jennings v. Woodford, 290 F.3d 1006 (9th Cir.2002); Brownlee v. Haley, 306 F.3d 1043 (11th Cir. 2002); Ainsworth v. Woodford, 268 F.3d 868 (9th Cir.2001); Mayfield v. Woodford, 270 F.3d 915 (9th Cir.2001); Lockett v. Anderson, 230 F.3d 695 (5th Cir.2000); Collier v. Turpin, 177 F.3d 1184 (11 Cir.1999) (counsel ineffective because jury not "presented with the particularized circumstances of his past”); Dobbs v. Turpin, 142 F.3d 1383 (11th Cir.1998) (counsel ineffective for failing to pursue and present evidence of petitioner's unfortunate childhood).

. Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986).

. Skipper, 476 U.S. 1, 2-3, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986).

. Id. at 3, 106 S.Ct. 1669.

. Id. at 7, 106 S.Ct. 1669 (emphasis added).

. Id. at 7, 106 S.Ct. 1669.

. Davis testified that he had refused the offer of two twenty-year sentences and had told Shaddock that, "for me at that time, that was a death sentence, and that I wouldn't take it.”

. Harkey testified that he had postured a potential plea of a life sentence plus ten or twenty years, to run consecutively.

. Wiggins, 539 U.S. at 537, 123 S.Ct. 2527.