ROBERTS, J.,
for the Court:
¶ 1. A jury sitting before the Noxubee County Circuit Court found R.C. Hibbler guilty of statutory rape. The circuit court sentenced Hibbler to twenty years in the custody of the Mississippi Department of Corrections (MDOC). Hibbler appeals. Because we find merit to Hibbler’s claim that he received ineffective assistance of counsel, we decline to address Hibbler’s claims that there was insufficient evidence to find him guilty and that the jury’s verdict is contrary to the overwhelming weight of the evidence. Consequently, we reverse the judgment of the circuit court and remand this matter for a new trial.
FACTS AND PROCEDURAL HISTORY
¶ 2. Hibbler’s conviction stems from his contact with Jane,[1] a thirteen-year-old girl who had been diagnosed with “reactive attachment disorder” and who has been described as having “borderline intellectual functioning.” It is undisputed that Jane visited Hibbler’s home to play with Hib-bler’s twin daughters on Saturday, April 16, 2005. Hibbler was sixty-nine years old at that time.
¶ 3. The following Tuesday, Jane told an unidentified “case manager” that Hibbler had raped her the previous Saturday. She had not told her family or anyone else that Hibbler had raped her. The case manager told Jane’s school counselor, Travonder McCloud, that Jane said she had been raped. That same day, McCloud relayed Jane’s allegation to the Macon Police Department. Later that Tuesday, Robert Brown, the Macon Chief of Police, and Janie Tate, a social worker, took Jane to see Dr. Sykes,[2] a pediatrician. Dr. Sykes examined Jane and concluded that her hymen was still intact. Dr. Sykes also recommended that Chief Brown and Tate take Jane to be examined by Dr. Mark Burtman, a obstetrician and gynecologist. Still that same day, Dr. Burtman tested Jane for sexually transmitted diseases and concluded that Jane had chlamydia. On April 28, 2005, Chief Brown and Tate took Jane to meet with Carla Horne, a Licensed Professional Counselor with the East Mississippi Children’s Advocacy Center.
¶ 4. On June 29, 2005, Hibbler voluntarily went with Chief Brown to the Noxubee *835 County Health Department, where Hib-bler was tested for sexually transmitted diseases. Hibbler did not have chlamydia. Approximately two months later, Hibbler was indicted and charged with statutory rape. He pled not guilty and hired Attorney Jeffrey Hosford to represent him.[3]
¶ 5. Hibbler went to trial in March 2008. The prosecution called Jane, who was sixteen years old at that time, as its first witness. The circuit court allowed the prosecution to ask Jane leading questions during direct examination due to what the circuit court later described as Jane’s “obvious ... diminished intellectual functioning.”
¶ 6. Jane testified that on April 16, 2005, she had been playing outside Hibbler’s house with Hibbler’s twin daughters when Hibbler told her to “come in the house.” Jane said that Hibbler “pulled [her] in [his] room” after she complied. According to Jane, Hibbler “put [her] on the bed” and “had sex with [her].” When asked to explain what she meant, Jane said, “He raped me.” Jane testified that she did not see any of Hibbler’s “body parts,” but Hibbler hurt her and made her bleed. Jane further testified that when Hibbler was finished having sex with her, he slapped her and told her, “Don’t tell.” Jane said she then got dressed and ran home. When the prosecution asked Jane to identify Hibbler, the following exchange transpired:
Q. And the individual that you’ve indicated here is Mr. Hibbler, the one who had sex with you. Is that — do you see him in the courtroom today?
A. (No verbal response).
Q. If you would just take a minute and look around the courtroom and see whether or not he’s in here. Do you see him in the courtroom, [Jane]?
A. (No verbal response).
Q. Do you see Mr. Hibbler here, [Jane]? If you see him, could you point to him, please, ma’am?
A. [ (]The witness pointed to Mr. Hib-bler).
The following exchange is Hosford’s entire cross-examination of Jane:
Q. [Jane]—
A. Yes.
Q. —were you diagnosed by the doctors with a condition called [c]hlamydia?
A. Yes.
Q. And you had to take medication for that; is that correct?
A. Yes.
Q. And after that, you went to see several doctors, didn’t you?
A. Yes.
¶ 7. Next, the prosecution called McCloud, who testified regarding her involvement in relaying Jane’s report. During cross-examination, Hosford asked McCloud to elaborate regarding why she had been counseling Jane for approximately two years. McCloud responded that Jane “has what we call reactive attachment disorder. She has a diagnosis — she had a *836 diagnosis of — I can’t remember, borderline intellectual functioning or something.” McCloud elaborated that reactive attachment disorder occurs “when the child is not getting everything that she needs at home[, so] she develops an attachment.” McCloud went on to testify that “it’s hard for [Jane] to socialize.”
¶ 8. The prosecution called Horne as an expert forensic interviewer. The prosecution asked Horne to explain “the protocol that [she] used” when she interviewed Jane. Horne explained, and then said that during her interview, Jane had said that Hibbler had “touched her on her pancake.” Next, the prosecution asked Horne to identify a document. Horne again testified that Jane had said that she had been touched “on her pancake.” Horne clarified that Jane meant “where you go to the potty.” Hosford did not object to Horne’s hearsay testimony.
¶ 9. Hosford finally objected when Horne began to testify as to what Jane said when Horne had asked Jane, “[W]hat did he touch you with[?]” The circuit court excused the jury from the courtroom. During arguments on the admissibility of Horne’s hearsay testimony, the prosecution requested a hearing on the tender-years exception. The circuit court later stated that “Hosford should have objected to the testimony of the witness to begin with that she is not competent as a witness.” The circuit court went on to state that “if you had made an objection to the child testifying ..., I might have declared the child unavailable.” Ultimately, the circuit court held that Horne was prohibited from testifying as to what Jane said during her interview. However, the circuit court further held that Horne would be allowed to “testify as to her observations of [Jane’s] demeanor,” and that Horne could “offer an opinion as to whether or not the symptoms and characteristics she observed in [Jane were] consistent with the symptoms and characteristics of small children who have had sexual abuse.” After the jury returned to the courtroom, Horne testified that Jane’s “knowledge of sexual — her knowledge about the physical body changes in someone who is having sex. She shouldn’t have that knowledge unless she’s been provided that information from somewhere.”
¶ 10. During cross-examination, Horne conceded that “[thirteen-]year[-]old children get pregnant every day.” Horne also admitted that she had not asked Jane whether she had any other sexual experiences. Next, Chief Brown testified that his observation of Hibbler’s bedroom was consistent with Jane’s description.
¶ 11. Called as an expert witness, Dr. Burtman testified that Jane denied that she had ever had any sexual contact with anyone other than Hibbler. Dr. Burtman confirmed that Jane tested positive for chlamydia. Dr. Burtman testified that he decided to test Jane for sexually transmitted diseases after he discovered that Jane had a white vaginal discharge. According to Dr. Burtman, the only way that Jane could have tested positive for chlamydia was “if there was actual penile penetration of the vagina.”
¶ 12. Dr. Burtman also testified that the antibiotic Azithromycin can successfully treat chlamydia in approximately two to four weeks. The prosecution asked Dr. Burtman the following hypothetical question: “If a male had [c]hlamydia on April the 16th, 2005, would he have time to clear up, say, in late June or July?” Dr. Burt-man answered, “It’s entirely possible even without treatment he may become negative after a matter of a few weeks. So, yes, by June he could be completely free of the disease.”
¶ 13. On cross-examination, Dr. Burt-man testified that Jane’s hymen was intact *837 when Dr. Sykes examined her. However, Dr. Burtman explained that Jane’s hymen could remain intact even if Hibbler had intercourse with her. When asked whether he could “say [with] medical certainty that [chlamydia] would have cleared up in two to three weeks,” Dr. Burtman conceded that he could not be certain, but it was possible. Dr. Burtman added that some people contract chlamydia and clear up without even realizing that they had ever been infected.
¶ 14. Hibbler’s first witness was Jane’s mother, Cathy.[4] Hosford attempted to have Cathy testify that she told Hibbler’s wife, Betty, that Jane had said that Hib-bler did not rape her. However, Cathy denied that she had ever told Betty that Jane had lied about Hibbler raping her. Cathy’s testimony did not benefit Hibbler’s defense in any way. Hibbler’s wife, Betty, testified after Cathy. Betty testified that Hibbler was diabetic and that he had suffered from erectile dysfunction during their entire twenty-year marriage. According to Betty, she and Hibbler had never had intercourse.[5]
¶ 15. Betty also testified that Cathy had said that an unspecified person persuaded Jane to falsely accuse Hibbler. Hosford never asked Betty whether she had tested positive for chlamydia. During cross-examination, the prosecution asked Betty to elaborate on whether she and Hibbler had ever had intercourse. Betty answered, “We make out every now and then.” She also testified that Hibbler is “unable to even put his penis in anybody.”
¶ 16. Hibbler chose to testify. He denied that he had sex with Jane. He also testified that he had been unable to obtain an erection during his and Betty’s twenty-year marriage. Hosford attempted to introduce documentary evidence that Hib-bler did not have chlamydia when he was tested at the Noxubee County Health Department. However, the circuit court would not allow Hosford to introduce those documents because Hibbler could not interpret the test results. However, Hibbler was allowed to testify that he did not receive any prescriptions to treat chlamydia as a result of his tests at the health department.
¶ 17. During a lunch recess, Hosford rushed to find a witness to sponsor the documents from the health department. He was able to call Linda Jones, a nurse employed by the health department. Jones testified that Hibbler tested negative for chlamydia during June 2005. However, to Hosford’s apparent surprise, Jones eviscerated Hibbler’s defense theories during cross-examination. That is, Jones noted that Hibbler had indicated that he had one female sexual partner on June 1, 2005. Jones further testified that Hibbler had also indicated that he had taken unspecified medication to treat bronchitis during the two weeks prior to his visit to the health department. According to Jones, if Hibbler had chlamydia, it could have cleared up if he had taken antibiotics to treat his bronchitis. On redirect, Jones reiterated that Hibbler tested negative for chlamydia during June 2005.
¶ 18. The prosecution called McCloud again during its rebuttal. McCloud bolstered Jane’s credibility by testifying that McCloud had “never known [Jane] to be untruthful with [her].” As previously mentioned, the jury found Hibbler guilty of statutory rape, and the circuit court sentenced Hibbler to twenty years in the custody of the MDOC.
*838 ¶ 19. On July 31, 2008, Hibbler fired Hosford, replaced him with his current counsel, and later filed a supplemental motion for a JNOV or new trial. In his post-trial motions, Hibbler claimed that he had received ineffective assistance of counsel. Hibbler also filed a motion to investigate juror misconduct. Hibbler claimed a juror—the foreperson of the jury—concealed that she had been the victim of a sexual assault during her childhood. Hibbler further claimed that the juror was biased and that she improperly inflamed the jury against him by presenting matters that were not in evidence to the other jurors during deliberations. Hibbler attached an affidavit from a person who swore she worked with the juror central to Hibbler’s juror-misconduct allegation. According to the affiant:
At the conclusion of [Hibbler’s] trial, [the juror] returned to the store[,] and I heard her make statements to customers regarding sexual assaults that were made upon her as a child. She also made statements to me about her childhood which concerned her being raped as a child by a family member. She said that nothing was ever done about it even though she reported it to her mother. She then stated that her mother stood by and allowed [the juror] to be molested[,] and blamed her for the molestation.
Finally, the affiant swore that she heard the juror make the following statements:
a. [“Hibbler] thought he was going to get some free p-, but we put his black a—away.”
b. “This ... is something that will haunt [Jane] for the rest of her life[,] and it will cause her to do things she wouldn’t normally/ordinarily do.” After being asked what, [the juror] stated[,] “[I]t will make her promiscuous because that’s how I am.”
c. [“Hibbler’s] wife was there defending him when he was f-with his daughters.... [”]
d. [“] Different members of the jury were uncertain about [Hibbler’s] guilt or innocence, but when I told them that s— about him f- his daughters ... they hurried up and made up their minds.[”]
¶20. On February 5, 2010, the circuit court conducted an evidentiary hearing on Hibbler’s post-trial motions. Although Hibbler had subpoenaed the former juror he accused of misconduct, the circuit court admonished Hibbler’s attorney for doing so without first obtaining the circuit court’s permission. Hibbler’s attorney clarified that he had not interviewed or otherwise communicated with the former juror. Hibbler went forward with his motion for a JNOV or new trial. The prosecution called Hibbler’s former attorney, Hosford, as a witness during the evidentia-ry hearing. Hosford’s testimony is discussed below in greater depth. Ultimately, the circuit court found no merit to Hibbler’s claim that he had received ineffective assistance of counsel. Hibbler appeals.
ANALYSIS
INEFFECTIVE ASSISTANCE OF COUNSEL
¶ 21. In general, we should address the merits of an ineffective-assistance-of-counsel claim on direct appeal only when “(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.” Robinson v. State, 68 So.3d 721, 723 (¶ 10) (Miss.Ct.App.2011) (citation omitted). Furthermore, on direct appeal, “[r]eview ... of an ineffective-assistance- *839 of-counsel claim is confined strictly to the record.” Id. The dissent would affirm the circuit court’s judgment so Hibbler could raise his ineffective-assistance-of-counsel claim in a motion for post-conviction relief. However, it is unnecessary to do so because the circuit court has already conducted an evidentiary hearing on Hibbler’s claim and addressed it on the merits. Hibbler’s direct appeal is unusual because the prosecution called Hosford, Hibbler’s trial counsel, as a witness during the hearing on Hibbler’s post-trial motions. During that hearing, Hosford waived the attorney-client privilege and testified regarding the extent of his pretrial preparation — or lack thereof, his trial tactics, his decision to focus his trial strategy solely on Jane’s chlamydia infection, and his decision not to pursue other defense theories. The record contains the circuit court’s ruling on Hib-bler’s ineffective-assistanee-of-counsel claim. Accordingly, the record is quite adequate to review Hibbler’s claim on direct appeal. The evidentiary hearing on Hibbler’s post-trial motions is the functional equivalent of an evidentiary hearing on ineffective assistance of counsel in the context of a motion for post-conviction relief.
¶ 22. Hibbler must prove that: (1) his counsel’s performance was deficient, and (2) the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In so doing, Hibbler faces the “strong presumption that counsel’s performance falls within the range of reasonable professional assistance.” Robinson, 68 So.3d at 723 (¶ 9). To overcome that presumption, Hibbler “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id.
¶ 23. Hibbler raises several claims of ineffective assistance of counsel. First, Hibbler claims that Hosford was ineffective because Hosford did not interview any witnesses other than Hibbler. Hosford admitted that his defense theory relied entirely on the basis that Jane tested positive for chlamydia three days after the date she claimed Hibbler raped her, but Hibbler did not have chlamydia when he was tested approximately two months later. Hosford did not attempt to interview Jane. Nor did Hosford interview Hibbler’s daughters, whom Jane had been playing with on the date that Jane said Hibbler raped her. Hibbler’s daughters could have shed light on whether Hibbler called Jane into their house or whether Jane left abruptly and ran home.
 ¶ 24. Likewise, Hosford failed to interview Jane’s father, who would have been the first person to encounter Jane after she returned from Hibbler’s house. Hosford also failed to interview any of Jane’s teachers, McCloud, or the unidentified person to whom Jane first reported her accusations against Hibbler. If Hos-ford had interviewed Dr. Burtman or Jones, whose expert testimonies caught Hosford by surprise and eviscerated his defense theories, Hosford could have been prepared to impeach them. “It takes no deep legal analysis to conclude that an attorney who never seeks out or interviews important witnesses and who fails to request vital information was not engaging in trial strategy.” Davis v. State, 87 So.3d 465, 469 (¶ 21) (Miss.2012). “Basic defense ... required complete investigation to ascertain every material fact about this case, favorable and unfavorable.... It required ... interviewing every possible eyewitness, and getting statements from each.” Triplett v. State, 666 So.2d 1356, 1361 (Miss.1995). The Mississippi Supreme Court has further held: “It is true that this Court should give deference to an attorney’s judgment in what investigation *840 should be conducted. However, there are limits. At a minimum, counsel has a duty to interview potential witnesses and to make [an] independent investigation of the facts and circumstances of the case.” Payton v. State, 708 So.2d 559, 561 (¶ 8) (Miss.1998) (citation and internal quotations omitted).
¶25. Additionally, Hosford failed to adequately cross-examine Jane. Hosford only asked her three questions during cross-examination, revealing only that Jane had tested positive for chlamydia three days after the day she claimed Hib-bler raped her. Hosford claimed that he did not want to inflame the jury against Hibbler by appearing to attack Jane. But there are many degrees of cross-examination between “attacking” a witness and leaving her testimony unchallenged. Hos-ford could have treated Jane gently and still asked her why she did not tell her father that Hibbler had raped her as soon as she returned from Hibbler’s home. Hosford could have also gently asked Jane why she waited until Tuesday to tell someone that Hibbler had raped her the previous Saturday.
¶26. Hosford also admitted that he had information that Jane had previously accused someone else of raping her, but Hosford incorrectly believed that he would unequivocally be prohibited from introducing the evidence. Hosford could have filed a motion under Rule 412 of the Mississippi Rules of Evidence to attempt to show that Jane’s chlamydia was the result of sexual contact with a third party. It is true that “in a criminal case in which a person is accused of a sexual offense against another person, reputation or opinion evidence of the past sexual behavior of an alleged victim ... is not admissible.” M.R.E. 412(a). But there are exceptions to Rule 412(a). Under Rule 412(b)(2)(A), evidence of a victim’s past sexual behavior with “persons other than the accused” is admissible if it is “offered by the accused upon the issue of whether the accused was or was not, with respect to the alleged victim, the source of ... disease.” Hosford could have attempted to demonstrate that the person Jane had previously accused of rape was the actual source of Jane’s chlamydia.
¶ 27. Hosford also had information that Jane had indicated that Hibbler did not rape her or otherwise have inappropriate contact with her, but Hosford never confronted Jane with that information. “Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.” Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Hos-ford completely failed to challenge the believability of Jane’s testimony. In effect, Hosford conceded it.
¶ 28. Hosford also failed to effectively cross-examine Dr. Burtman. According to Hosford, Dr. Burtman’s testimony that “[i]t’s entirely possible even ■without treatment [that Hibbler] may become negative [for chlamydia] after a matter of a few weeks” contradicted “all medical journals that [Hosford] had read.” When asked to elaborate on his research, Hosford replied that he “went online and researched [chlamydia] on WebMD and several other medical sites.” Hosford even claimed that he had brought documentation to trial that contradicted Dr. Burtman’s testimony. However, Hosford had absolutely no explanation as to why he did not attempt to impeach Dr. Burtman’s testimony with learned treatises. If Hos-ford had been adequately prepared for Hibbler’s trial, Hosford could have asked Dr. Burtman about the incubation time of chlamydia, the effectiveness of various antibiotics, or whether Hibbler’s test meant that he had never had chlamydia because *841 the test did not detect the presence of an antigen. Regardless, Hosford was not prepared to contradict the medical testimony regarding the concept that Hibbler somehow cured himself of chlamydia without treatment in two months between the date of the incident and the date he was tested. Nor did Hosford ask Betty whether she had ever been tested for chlamydia or, if she had, whether she tested positive. Such questions would shed light on the issue regarding whether Hibbler infected Jane with chlamydia or, even if he had not, whether he could have raped Jane without becoming infected, and, if the prosecution’s theory was correct, whether Hibbler would have infected Betty if they had sex on June 1, 2005. Unfortunately, those loose ends were never addressed and remain unresolved.
¶ 29. Furthermore, Hosford did not question Dr. Burtman regarding the likelihood that Hibbler’s age and diabetic condition could have negatively impacted Hib-bler’s ability to sustain an erection. Nor was Hosford prepared to ask Dr. Burtman any questions regarding the incubation time necessary between exposure to chlamydia and a positive test for chlamydia. Had Hosford prepared, he could have confronted Dr. Burtman with the fact that “because [cjhlamydial infections rarely cause symptoms in women, they have a long incubation period” and “because the incubation period for [chlamydia] is 6-14 days, women may not relate their subtle symptoms to a distant exposure.”[6] Hos-ford could have demonstrated that Jane’s chlamydia could not have resulted from sexual contact with Hibbler three days earlier because “[i]f symptoms [of chlamydia] do occur, they usually appear within 1 to 3 weeks after exposure.”[7] Nor did Hosford confront Jones with information that “[b]ecause of the unique intracellular characteristics of [chlamydia], only certain antibiotics are effective in treatment” after Jones testified that unspecified medication that Hibbler reportedly took could have “cleared up” chlamydia if Hibbler had actually been infected with it and if Hibbler’s bronchitis medication had been an antibiotic. Such unanswered questions are exactly why the Second Circuit Court of Appeals has held:
[I]n a case where the only direct evidence that any crime occurred or that, if it did, the [defendant] committed it, was the testimony of the alleged victim, for defense counsel to simply concede the medical evidence without any investigation into whether it could be challenged was performance that ... could not ... be objectively reasonable.
Gersten v. Senkowski, 426 F.3d 588, 608 (2d Cir.2005).
¶ 30. By calling Jones, Hosford set the stage for her to eviscerate the defense theories that Hibbler could not have been guilty because (a) he was a diabetic who suffered from erectile dysfunction; and (b) Jane had chlamydia three days after the date she claimed Hib-bler raped her, and Hibbler did not have chlamydia two months after that date. Hibbler had already testified that he did not receive a prescription to treat chlamydia as a result of his visit to the health department. Because Hosford did not impeach Dr. Burtman’s testimony with the learned treatises that Hosford claimed he brought to trial, Hosford’s defense theory *842 regarding Hibbler not having chlamydia had no teeth. Nevertheless, Hosford called Jones to sponsor Hibbler’s health-department records. Jones devastated Hosford’s theories by testifying that whatever bronchitis medication Hibbler took could have cleared up chlamydia, and one of the documents Hosford submitted through Jones indicated that Hibbler had last had sex on June 1, 2005.
¶ 81. The dissent cites Jackson v. State, 73 So.3d 1176, 1181 (¶ 20) (Miss.Ct.App. 2011) for the principle that “[i]nadequaey of counsel refers to representation that is so lacking in competence that the trial judge has the duty to correct it so as to prevent a mockery of justice.” (Internal quotations omitted). However, the “mockery of justice” standard stems from precedent that predates the Supreme Court’s decision in Strickland. See Diggs v. Welch, 148 F.2d 667, 669 (D.C.Cir.1945). As previously mentioned, Hibbler must prove that: (1) his counsel’s performance was deficient, and (2) his counsel’s deficient performance prejudiced Hibbler’s defense. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. The Supreme Court certainly did not base a prima facie case of ineffective assistance of counsel on an analysis of the sufficiency of the evidence, as the dissent seems to suggest. To the extent that the dissent finds that sufficient evidence equates to Hibbler’s failure to demonstrate prejudice, the dissent fails to address the numerous instances of prejudice that this opinion highlights. And although there is corroborative evidence of the appearance of Hib-bler’s bedroom and the fact that Jane had sexual contact with someone, no evidence corroborated Jane’s testimony that Hib-bler had sex with her. Even if there had been more evidence to support a guilty verdict, the Supreme Court recently held that “[tjhere are instances ... where a reliable trial does not foreclose relief when counsel has failed to assert rights that may have altered the outcome.” Lafler v. Cooper, — U.S. -, -, 132 S.Ct. 1376, 1388, 182 L.Ed.2d 398 (2012).
¶ 32. “When determining if both prongs of the Strickland test have been met, deficient performance and resulting prejudice from those deficiencies, this Court must look to the totality of the circumstances.” Payton, 708 So.2d at 563 (¶ 12). Hosford formed a defense theory based on a premise that he was unprepared to defend. Hosford was also unprepared to impeach the prosecution’s witnesses because he incorrectly believed his faulty defense theory would be all that mattered. Hosford failed to present evidence that would have tended to rule out Hibbler as the source of Jane’s sexually transmitted disease. As stated by the Second Circuit:
[W]here the record evidence in support of a guilty verdict is thin, as it is here, there is more likely to be prejudice. This is even more true where counsel’s failures go to something as important as the medical evidence in this case — the only objective evidence that a crime occurred and the only evidence directly corroborating any aspect of the victim’s story.
Gersten, 426 F.3d at 613-14.
¶ 33. Hibbler did not confess or otherwise admit that he was guilty. The prosecution did not present any evidence that corroborated Jane’s testimony that Hibbler had sex with her. The prosecution’s theory of Hibbler’s guilt rested on the claim that Hibbler infected Jane with chlamydia, but somehow mysteriously cured himself. Essentially, this case boiled down to a question of whether Hib-bler was more credible than Jane. And Hosford left Jane’s credibility unchallenged because he incorrectly thought his faulty and incomplete defense theory *843 would render her credibility immaterial. Hosford declined to interview anyone other than Hibbler prior to Hibbler’s trial. Despite Hosford’s claim that he had copies of learned treatises that would have casted doubt on Dr. Burtman’s testimony that chlamydia could “clear up” on its own, Hosford neglected to confront Dr. Burt-man with those treatises. Moreover, Hos-ford erroneously believed that he was unequivocally prohibited from inquiring into Jane’s prior sexual history. He did not file a motion under Rule 412(c) to determine if Jane’s past sexual behavior with another person was the source of Jane’s chlamydia infection. Dr. Burtman decided to test Jane for sexually transmitted diseases after he discovered that Jane had a white vaginal discharge. If the incubation time for a chlamydia infection is between six to fourteen days after exposure, and Jane tested positive for chlamydia on Tuesday, April 19, 2005, then Jane’s positive test could not have been due to any alleged sexual contact with Hibbler on Saturday, April 16, 2005. “Defense counsel may not fail to conduct any investigation and then rely on the resulting ignorance to excuse his failure to explore a strategy that would likely have yielded exculpatory evidence.” Gersten, 426 F.3d at 610. Based on a totality of the circumstances, we must conclude that there is a reasonable probability that, but for Hosford’s deficient performance, the result of Hib-bler’s trial would have been different. Accordingly, we reverse the judgment of the circuit court and remand this matter to the circuit court’s active docket for retrial.
¶ 34. THE JUDGMENT OF THE NOXUBEE COUNTY CIRCUIT COURT OF CONVICTION OF STATUTORY RAPE AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS REVERSED, AND THE CASE IS REMANDED FOR A NEW TRIAL CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO NOXUB-EE COUNTY.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ISHEE, MAXWELL, RUSSELL AND FAIR, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION.

. We use a fictitious name to protect Jane's identity.

. Dr. Sykes’s first name is not included in the record.

. Hosford stated that Hibbler hired him before Hibbler was indicted. However, the record is somewhat inconsistent with Hosford's recollection. The record indicates that the circuit court appointed Attorney Richard Bur-dine to defend Hibbler on September 20, 2005. The record does not contain Hosford's entry of appearance, but Hosford filed a motion for discovery on March 6, 2006. On March 20, 2006, Hosford signed an agreed order for a continuance. But on September 11, 2006, the circuit court entered an order allowing Burdine to withdraw as Hibbler’s attorney and substituting Attorney Shane Tompkins for Burdine. It is unclear why the circuit court would appoint Tompkins to represent Hibbler when Hosford had filed a motion for discovery and executed an agreed order for a continuance approximately six months earlier.

. We use a fictitious name for Jane’s mother to further protect Jane’s identity.

. Their twin daughters were adopted.

. Albert John Phillips, “Chlamydial Infections,” Nurse Practitioners in Women's Health, http ://ww w. npwh.org/files/public/ Phillips% 20chapter.pdf (last visited Aug. 2, 2012).

. Centers for Disease Control and Prevention — Chlamydia Fact Sheet, http://www.cdc. gov/std/chlamydia/STDFact-Chlamydia.htm (last visited Aug. 2, 2012).