# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-KA-00038-SCT

*JASON ISHAM a/k/a JASON C. ISHAM a/k/a*
*JASON CLARK ISHAM*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 01/16/2014 |
| TRIAL JUDGE: | HON. GERALD W. CHATHAM, SR. |
| TRIAL COURT ATTORNEYS: | WILLIAM ROBERT BRUCE |
| | STACEY ALAN SPRIGGS |
| | STEVEN JUBERA |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: MOLLIE MARIE McMILLIN |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 04/23/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     Jason Isham was convicted in the Circuit Court of DeSoto County of one count of

felonious child abuse pursuant to Mississippi Code Section 97-5-39(2). His wife's two-year-

old son, Tommy,[1] was hospitalized in May, 2012, for a severe, traumatic brain injury, which

---

[1]Because of the child's minority, this Court will refer to him by the pseudonym,
*Tommy*.

caused severe swelling of the child's brain, stroke, and permanent weakness on his right side. Because Isham was alone with Tommy when this occurred, he was charged with felonious child abuse of Tommy. At trial, expert medical witnesses for the State testified that Tommy's injuries resulted from severe blunt trauma. Isham, who was represented by a public defender and a *pro bono* attorney, requested funds with which to hire his own expert to testify about possible alternative causes for Tommy's injuries. The trial court denied the request. On appeal, Isham raises one issue: that the trial court erred when it refused him the funds necessary to hire an expert in his defense. In light of this Court's recent holding in ***Brown v. State***, 152 So. 3d 1146 (Miss. 2014), we reverse Isham's conviction and remand the case for a new trial in which the trial court must order public funds for such defense experts as are necessary for the accused to prepare and present an adequate defense.

## FACTS AND PROCEDURAL HISTORY

¶2.    Jason Isham lived with his wife, Mary Beth, and her then-two-year-old son Tommy in DeSoto County, Mississippi. On April 30, 2012, Mary Beth noticed that the back of the child's head was swollen and mushy, and that Tommy had a 103-degree temperature. Although Tommy had spent the previous few days with his biological father, the child had not exhibited any health problems when he returned to the residence of his mother and Isham. Tommy was treated at LeBonheur Hospital in Memphis, Tennessee.

¶3.    Dr. Karen Lakin examined Tommy at LeBonheur and noticed "a lot of soft tissue swelling all around his head, in the back of his ears a lot of bruising, . . . [a]nd probably the most remarkable is the amount of swelling that he had and the amount of bruising that he had

2

around his head." Dr. Lakin diagnosed the child with soft-tissue swelling and significant bruising to the scalp and forehead, concluding that these conditions could not have been caused by a roller-skating accident the week before and "appeared to be from some type of blunt force trauma, but the amount of bleeding was out of proportion to what we would see with a trivial fall." Dr. Lakin interpreted the child's injuries to be a result of child abuse, and she therefore reported Tommy's condition to the Department of Human Services so that it could investigate whether his injuries were the result of "nonaccidental trauma."

¶4.    Tommy returned home from Le Bonheur Hospital with Mary Beth and Isham on May 3, 2012. From May 7 to May 9, Tommy stayed at his biological father's home. The child was fine throughout that visit. Then, on May 10, he returned to Mary Beth's custody. On May 11, 2012, after being with his mother and Isham for a day, the child was very drowsy and nauseated. He also reacted very negatively to sunlight.

¶5.    The next day, Mary Beth fed Tommy some cut-up bites of hot dog and laid him down for a nap between 11:30 a.m. and 12:00 p.m. Mary Beth left the house to run an errand around 12:30 p.m.; but before she had been gone more than ten minutes, she received a frantic phone call from Isham informing her that Tommy was unresponsive and was having trouble breathing. Mary Beth immediately returned home and attempted to perform CPR on Tommy.

¶6.    An ambulance was called, and it transported Tommy to the emergency room at Baptist DeSoto Hospital. There, he was treated by emergency room physician Dr. Rosa Gomez. The child was blue from oxygen deprivation, and his body was very "spastic," alternating

3

between conditions of extreme rigidity and extreme flaccidity. His left pupil was blown, meaning that it was large and nonreactive, indicating that the child had severe internal bleeding within his skull. When Tommy arrived at the emergency room, no medical professionals observed the presence of external injuries to his person.

¶7.    Because emergency room physicians suspected that Tommy had suffered a traumatic brain injury, the child was then airlifted from Baptist DeSoto Hospital to LeBonheur Hospital in Memphis, where he was treated by Dr. Stephanie Einhaus, a pediatric neurosurgeon. When Tommy arrived at LeBonheur, a CAT scan revealed a blood clot on the right side of his brain as well as a significant bruise, or contusion, on the left side of his brain. Dr. Einhaus performed emergency surgery to relieve the swelling in his brain, which entailed removing a window of bone from the skull to allow the brain room to swell. After the surgery, the child experienced several other complications. His brain continued to swell despite Dr. Einhaus's efforts, which included draining fluid from the brain and placing Tommy in a medically induced coma. Dr. Einhaus discovered that Tommy had suffered a stroke in the left side of his brain, for which emergency surgery on the right side of the child's brain was necessary to prevent another stroke and further damage from swelling.

¶8.    The child survived the trauma and the surgeries; but he had to relearn to talk and has permanent weakness on the right side of his body. Because Tommy had exhibited signs of abuse on April 30, 2012, while he was in the care of Isham, because Tommy did not begin to show injuries until he began living in Isham's home, and because Tommy exhibited serious head injuries consistent with abusive blunt-force trauma and shaking after being in

4

Isham's care, Jason Isham was charged with felonious child abuse pursuant to Mississippi Code Section 97-5-39(2).

¶9. Before trial, Isham designated two experts, Dr. Terry Moore and Dr. Joseph Wippold. Isham stated that Dr. Moore, a professor of internal medicine and pediatrics and director of pediatric rheumatology, diagnosed Tommy with Systemic Lupus Erythematosus and CNS Vasculitis. Dr. Wippold, a neuroradiologist, opined that nonaccidental trauma was not the cause of Tommy's head injuries. On October 17, 2013, eleven days before trial was to begin, Isham filed his Motion for State to Pay for Expert Fees and for Continuance if Necessary to Secure Attendance or Testimony, requesting funds "to pay the expenses of obtaining the presence at trial of his identified experts . . . or alternatively to pay the expenses of securing deposition testimony to be presented at trial." He stated that he was indigent and that the trial court had appointed a public defender to represent him, and that he also was represented by *pro bono* counsel. He explained that the testimony of Drs. Moore and Wippold would be necessary for his defense.

¶10. The trial court held a hearing on the motion for funds on October 22, 2013. Isham's counsel informed the court that Isham was indigent, as evidenced by the court's having appointed him a public defender. Isham's counsel explained that, because the State had the benefit of medical experts, it was only fair for Isham to be given the opportunity to consult an expert and "to provide an explanation for the observations and the condition of the child in this case."

5

¶11. The trial court agreed that Isham probably should have an expert. "In a perfect world, I suppose that the county should be required to provide the defense with—an indigent defendant with experts. However, I don't know that I have any authority to order that." The State contended that the proposed defense experts would be unavailable for trial on the date for which it was set, and that a continuance would be necessary to guarantee their appearance. The State also contended that Isham was not indigent because he had been released on a $50,000 bond.

¶12. Ultimately, the trial court denied Isham's motion for expert funding. It analyzed the three-factor test which the United States Supreme Court articulated in *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S. Ct. 1087, 1093, 84 L. Ed. 2d 53 (1985): (1) the private interest affected by the action of the state; (2) the governmental interest affected if the safeguards are provided; and (3) the probable value of the additional or substitute procedural safeguards that are sought and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. It then cited *Brandon v. State*, 109 So. 3d 128 (Miss. Ct. App. 2013), for the proposition that expert funding is "conditioned upon a showing that such expenses are needed to prepare and present an adequate defense." The trial court concluded that the defendant had not provided a concrete reason for requiring defense experts in the case "other than counsel's statement that they need an expert." The trial court also found the motion to be untimely, as it was filed eleven days before trial was scheduled to begin. The trial court stated that it was going to permit liberal cross examination of the State's witnesses, but that it would deny Isham's motion for expert funding.

¶13. Isham's trial commenced on October 28, 2013. Isham proceeded with no experts in his defense. The State's case-in-chief included the testimony of three expert witnesses.

¶14. First, Dr. Gomez, the physician who had treated Tommy in Baptist DeSoto Hospital's emergency room during his second hospitalization, was accepted as an expert in the field of emergency medicine. Dr. Gomez testified that when the child arrived at the emergency room, he was on the brink of death. He had turned blue from lack of oxygen, and he could not even swallow on his own. She testified that she was concerned Tommy had a bleed inside his head.

¶15. Next, Dr. Einhaus, the physician who performed Tommy's brain surgery, was accepted as an expert in the field of pediatric neurosurgery. As for the contusion that doctors had identified on the left side of the child's brain, Einhaus testified that the only cause for such an injury was "blunt force trauma period." Under cross-examination, Einhaus reiterated her conclusion that "the only thing that . . . could have caused [Tommy's] pathology is blunt force." Einhaus further testified that the patient did not have a bleeding disorder that could have explained his injury.

¶16. Finally, Dr. Lakin, the physician who had reported Tommy's injuries to the authorities as abuse and treated him after surgery, was accepted as an expert in general pediatrics and child-abuse pediatrics. Lakin testified that, in her opinion, the significant soft-tissue swelling could not be explained by Tommy's medical history. She stated that some of the redness and contusions were considered "battle sign[s]," meaning signs of abuse. Although the child had fallen approximately ten days earlier while he was roller skating, Lakin testified that there

7

was no history of "significant trauma that would explain the extent of the bleeding and the swelling that we saw." Mary Beth's family had a history of bleeding disorders, but Dr. Lakin testified that the extent of the bleeding could not be explained by any type of bleeding illness or disease. She concluded that Tommy's condition "appeared to be from some type of blunt force trauma, but the amount of bleeding was out of proportion to what we would see with a trivial fall."

¶17.    With regard to the child's health after his brain surgery, Dr. Lakin testified that there was no medical history of trauma that would explain his second set of injuries. She stated that the injury could not have resulted from trivial trauma, but that Tommy suffered "a life threatening injury that almost killed him." She testified that Tommy's injuries, a subdural hemorrhage in the brain combined with bilateral retinal hemorrhages—caused when blood vessels behind the retina rupture and hemorrhage—"were consistent with abusive head trauma." She went on to say that, although the subdural hemorrhaging is consistent with blunt-force trauma, retinal hemorrhaging is more consistent with severe shaking.

¶18.    At the close of trial, Isham was convicted of felonious child abuse and sentenced to thirty years in prison, followed by fifteen years of post-release supervision and a fine of $10,000. Isham has timely appealed.

## ANALYSIS

¶19.    Isham raises one issue on appeal. He contends that the "trial court erred in refusing to provide Isham funds to hire an expert witness with regard to the nature of and cause of Tommy's injuries."

¶20. Although we review a trial court's denial of expert assistance under an abuse-of-discretion standard, "[w]e will not hesitate to reverse a trial court's denial of expert assistance to an indigent defendant when the lack of expert assistance denied the defendant due process such that the trial was rendered fundamentally unfair." *Lowe v. State*, 127 So. 3d 178, 181 (¶ 14) (Miss. 2013) (citing *Fisher v. City of Eupora*, 587 So. 2d 878, 883 (Miss. 1991)). Accordingly, this Court's task is to determine whether the trial court's refusal to provide funds for expert assistance to Isham rendered his trial fundamentally unfair.

**1. Whether the trial court's denial of expert assistance rendered Isham's trial fundamentally unfair.**

¶21. The United States Supreme Court "has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense." *Ake*, 470 U.S. at 70.

¶22. In *Ake v. Oklahoma*, the United States Supreme Court addressed an indigent defendant's right to expert witnesses, concluding that the right at stake implicated a criminal defendant's access to justice:

> Meaningful access to justice has been the consistent theme of these cases. We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.

*Id.* at 76. The Court also wrote that "fundamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system'" and that

9

courts implement this principle by identifying the tools of an adequate defense and providing them to indigent defendants. *Id.* at 77.

¶23. Similarly, in *Lowe v. State*, 127 So. 3d 178 (Miss. 2013), this Court examined a criminal defendant's right to a fair trial in the context of an indigent litigant's request for funds to hire an expert to assist in his defense. In *Lowe*, the defendant was convicted of five counts of exploitation of a child with regard to images that he allegedly had downloaded onto his laptop computer. *Id.* at 179 (¶ 1). Because the State's entire case "relied solely on the opinions of its expert witness to establish that the files existed on Lowe's laptop," Lowe requested funds for an independent expert in computer forensics "to examine the computer's hard drive and to refute the State expert's allegations . . . ." *Id.* at 183 (¶¶ 21-22). The trial court denied the request.

¶24. This Court reversed Lowe's conviction and remanded for a new trial because the denial of expert assistance rendered his trial fundamentally unfair. *Id.* at 184 (¶ 26). Citing the United States Supreme Court's decision in *Ake*, this Court recognized that the defendant's right to an expert to assist in his defense derived from the Fourteenth Amendment's guarantee of due process and that "justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake." *Lowe*, 127 So. 3d at 182 (¶ 16) (quoting *Ake*, 470 U.S. at 76).

¶25. For an indigent defendant to be entitled to public funds to retain an expert, the expert must be a "basic tool of an adequate defense." *Id.* (¶ 17). In order to establish whether an

expert is a "basic tool for an adequate defense," the Court must analyze (1) the private interest that is affected by the action of the state; (2) the governmental interest that is affected if the safeguard is provided; and (3) the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. *Id.* (quoting *Ake*, 470 U.S. at 77).

¶26.   Under the first prong, the private interest involved is an individual's interest in accurate criminal proceedings, which is "uniquely compelling" and heavily weighs in the individual's favor. *Id.* (¶ 18).

¶27.   Next, we consider the second prong, which is the governmental interest that is affected if the safeguard is provided.  Under this prong, we consider the fact that the county has a pecuniary interest at stake in Isham's retention of an expert, given that the county government must provide funds for a court-ordered expert.  This interest, however, is insubstantial, comparatively speaking, and the government's interest in prevailing at trial is outweighed by the government's interest in resolving criminal cases fairly and accurately. *Id.* at 182-83 (¶ 18). Accordingly, in this case, both Isham's and the government's interest in a fair and accurate criminal trial far outweigh the county government's  pecuniary interest in the public funds it must pay to compensate Isham's expert witnesses.

¶28.   Finally, the third prong, which this Court analyzes the most intensely, requires the trial court to balance the probative value of expert testimony for Isham against the risk of not providing him expert assistance.

11

¶29. In *Lowe*, this Court held that Lowe's need for an expert was vital, because an expert could refute the State's allegations and assist Lowe in cross examining the State's expert. The Court noted that the State was required to prove that it was Lowe himself who had downloaded certain images onto the computer, and that it could not prove that element of the crime without expert testimony. *Id.* at 183 (¶ 21). The Court summed up its reasoning:

> Where, as here, the State relies on expert testimony *alone* to connect the defendant to the offense charged, an independent defense expert is part of the "raw materials integral to building an effective defense," and the trial judge deprives an indigent defendant of a fundamentally fair trial by refusing him funds to procure such an expert.

*Id.* at 184 (¶ 24) (emphasis added).

¶30. This Court very recently confronted the issue of expert assistance for a defendant accused of causing the death of his young son by striking and shaking him, causing severe head and brain trauma. In *Brown v. State*, 152 So. 3d 1146 (Miss. 2014), Leevester Brown was convicted of the capital murder of his son, who died of symptoms that Dr. Steven Hayne, a pathologist, deemed consistent with shaken-baby syndrome. *Id.* at 1156-57. Although there were no external bruises or abrasions, Brown's son suffered a subdural hemorrhage, meaning that blood had collected between the child's brain and skull, causing brain swelling, a midline shift, and compression of the brain stem. *Id.* at 1156 (¶ 43). Dr. Hayne also observed retinal hemorrhaging and determined that the retinal and subdural hemorrhaging were consistent with shaken-baby syndrome. *Id.* at 1157 (¶ 46).

¶31. Prior to trial, Brown requested funds with which to hire a medical expert to challenge Dr. Hayne's testimony regarding the cause of death of Brown's child. *Id.* at 1165 (¶ 89). The

trial court denied the motion because Brown had been able to post his own bail bond and retain his own legal counsel and had "made his own choices as to where to pay his monies." *Id.* Brown also submitted an affidavit showing his present condition of indigency. *Id.* This Court agreed with Brown that the proof of the charge against him consisted of the medical diagnosis and testimony of Dr. Hayne, and that the trial court's refusal to grant Brown the funds with which to retain an expert had denied him "'the raw materials integral to the building of an effective defense,' as he had absolutely no way to counter the State's sole evidence of the cause of death, or even to determine the proper questions to ask to challenge Dr. Hayne on cross." *Id.* at 1166 (¶ 92). The Court reversed, finding that "Dr. Hayne offered the *only* evidence on both the underlying felony of child abuse and the cause and manner of death, and Brown had no way to rebut it." *Id.* (¶ 93). This was reversible error because it rendered his trial fundamentally unfair. *Id.* (¶ 94) (citing *Lowe*, 127 So. 3d at 184).

¶32.    The Court also examined whether Brown was sufficiently indigent to require state funding for his expert. It held that the fact that Brown had been able to retain private counsel did not foreclose his obtaining state funds with which to pay for an opposing expert, and that the trial judge had erred when he had denied Brown's request without fully determining Brown's personal indigence. *Id.* at 1169 (¶ 99). Ultimately, because the expert was necessary to make the trial fair, the "trial court's failure to properly consider Brown's request for expert funds require[d] that we reverse and remand for a new trial." *Id.*

¶33.    The mandate of *Lowe* and *Brown* is abundantly clear: if the State relies on expert testimony alone to prove or corroborate an element of the crime, then the defendant is

entitled to an expert to assist in his defense and preparation for cross-examination. In such cases, the assistance of an expert is "a basic tool to an adequate defense," without which the defendant cannot receive a fair trial.

¶34.    In this case, to convict Isham of felonious child abuse, the State was required to prove that Isham himself caused the injuries to Tommy by sufficiently whipping, striking, or otherwise physically abusing or mutilating him to cause serious physical harm. *See* Miss. Code Ann. § 97-5-39(2)(c)(iii) (Rev. 2014). The State clearly proved that Tommy had suffered serious physical harm, and it showed that the harm seemed to occur whenever Tommy was in Isham's custody. However, the State also was required to prove that Isham had caused Tommy's injuries through hitting, striking, or otherwise abusing him, not only beyond a reasonable doubt, but, as this was a circumstantial evidence case, to the exclusion of every reasonable hypothesis consistent with innocence. *See **Montgomery v. State***, 515 So. 2d 845, 848 (Miss. 1987). Accordingly, it was essential to the State's case that it prove that the child's injuries were inflicted through blunt force or abusive nonaccidental trauma and that they could have been sustained by the child only through such nonaccidental trauma. It is unquestionable that the State's experts were the only source of the testimony concerning these essential components of the prosecution's proof.

¶35.    Dr. Lakin, who treated Tommy on both April 30 and May 12, 2012, testified that the child exhibited "battle signs"—evidence of abuse—when he came in for his soft-tissue swelling and bruising on April 30. On May 12, when Tommy became nonresponsive and required emergency brain surgery to save his life due to severe internal bleeding and swelling

14

of the brain, everyone who treated him testified that he had no outward indications of blunt-force trauma that would have caused such an injury. However, Dr. Einhaus, who performed the life-saving surgery on the child, testified that the subdural hematoma that was found in the brain was caused by "blunt force trauma period" and "the only thing that . . . could have caused [Tommy's] pathology is blunt force." Dr. Lakin also testified that Tommy's injuries "were consistent with abusive head trauma." Additionally, this expert testified that Tommy had hemorrhaging under his eyes that was consistent with severe shaking.

¶36.    All of the foregoing testimony was used to prove that Isham had caused serious bodily harm to Tommy through blunt-force trauma. It also was used to show that blunt-force trauma was the *only* way that Tommy could have received his injuries. As in both **Lowe** and **Brown**, the evidence against Isham was entirely circumstantial, and the State's primary evidence showing that Isham had committed the crime came through expert testimony. The trial court's denial of expert assistance to Isham prevented his trying to develop a "reasonable hypothesis consistent with innocence." It also denied him the opportunity to develop his defense in general and to improve his ability to question the State's experts. Although Isham's attorney may have been afforded liberal cross examination of the State's witnesses, he was left to figure out those questions on his own, without expert assistance.

¶37.    Further, Isham provided the court information indicating that expert witness testimony was crucial to establishing his defense. He made the trial court aware that Dr. Moore believed that Isham had suffered from a form of lupus, which could have caused his injuries, and that Dr. Wippold, a neuroradiologist specializing in the diagnosis of brain trauma,

15

believed that Tommy was injured through accidental trauma. It is possible that these could have formed the basis of a reasonable hypothesis consistent with innocence. Furthermore, it is clear that a rigorous cross examination of the State's experts would not produce this sort of information in front of a jury. Ultimately, although Isham filed the motion eleven days before trial was set to begin, the interest in providing a fair trial to the accused far outweighs the interest of the trial court in keeping a timely docket.

¶38. It is clear from the record that the trial court denied Isham's motion for funds to retain an expert not just because the motion was untimely but also because it misapplied *Ake* and its progeny. The court opined: "[i]n a perfect world, I suppose that the county should be required to provide the defense with—an indigent defendant with experts. However, I don't know that I have any authority to order that." It is clear that Isham required the assistance of medical experts as "a basic tool of an adequate defense." *Lowe*, 127 So. 3d at 182 (¶ 17). The State could not have proved its case against Isham without expert testimony, and the trial court deprived Isham of his right to a fair trial when it denied him funds to procure opposing experts.

## 2. Indigence

¶39. In order to be entitled to a State-funded expert, a criminal defendant must prove not only that the expert is necessary to the preparation of his defense, but he also must prove his indigency. *Ake*, 470 U.S. at 70. Here, the trial court's order assigning Isham a public defender clearly indicates that he was financially unable to pay for an attorney, and the case proceeded on the basis that Isham was indigent. Moreover, although Isham was released on

16

a $50,000 bond, this fact is not dispositive of Isham's indigent status. Here, Isham's mother was paying for his bail bond in monthly installments, and she had not paid it in full "by any stretch."

¶40. In *Brown*, we held that "the existence of retained counsel does not, in and of itself, bar a defendant from being indigent for purposes of a state-funded expert." *Brown*, 152 So. 3d at 1168 (¶ 97). Similarly, the fact that a defendant was able to post bail does not, in and of itself, determine such defendant to be financially able to hire his own experts.

¶41. Here, nothing in the record suggests that the trial court doubted Isham's indigence. Moreover, the trial court did not deny Isham's motion for expert funds because he was not indigent. Instead, the trial court denied the motion because it thought it was not within the power of the trial court to award those funds and because the court deemed Isham's motion to have been untimely.

## CONCLUSION

¶42. The trial court's denial of funds for the procurement of expert witnesses denied Jason Isham his due process rights under the Fourteenth Amendment to the United States Constitution and Article 3, Section 14, of the Mississippi Constitution and denied him his right to a fair trial. Accordingly, we reverse Isham's conviction and remand the case for a new trial in the Circuit Court of DeSoto County.

¶43. **REVERSED AND REMANDED.**

**DICKINSON, P.J., LAMAR, KING AND COLEMAN, JJ., CONCUR. RANDOLPH, P.J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER AND PIERCE, JJ. WALLER, C.J., NOT PARTICIPATING.**

**RANDOLPH, PRESIDING JUSTICE, CONCURRING IN RESULT ONLY:**

¶44. I concur in result only, as I do not find that the trial judge misapplied the law or abused his discretion. I would hold that the trial judge acted within his discretion to refuse an untimely motion for expert funding and to refuse to grant an untimely motion for continuance. Yet we should not turn a blind eye to Isham's claim that not having his own medical experts disadvantaged his defense. *See* ***Brandon v. State***, 109 So. 3d 128, 131 (Miss. Ct. App. 2013). That disadvantage deprived Isham of a fair trial. Rarely, but if justice requires, this Court considers errors, whether assigned or not, where the record supports a plain-error analysis. Here, the record reveals that deprivation was due to the actions or inactions of Isham's counsel, not trial-court error, for Isham's counsel failed to timely seek funding and/or to timely seek a continuance.[2] What could and should have been raised additionally on appeal was whether Isham's constitutional right to effective assistance of counsel was violated. *See* ***Strickland v. Washington***, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Accordingly, I would reverse and remand for a new trial, and the trial court should require expert funding, including necessary expenses to attend trial.

¶45. This conclusion is based on the clear and specific facts as presented in this record. Isham was denied a fair trial due to the failure of defense counsel to consult expert witnesses and to schedule their appearances, and if funds were necessary for further consultation and their appearances, to timely seek same.

Background

---

[2] Isham is represented by separate counsel on appeal.

¶46. An investigation into both Isham and his wife, Mary Beth Isham, began almost immediately following Tommy's need for emergency medical treatment in the spring of 2012. Mary Beth was represented by attorney Bill Bruce during the investigation and subsequent criminal proceedings. She also was represented by attorney Duncan Ragsdale in a medical malpractice claim and suit related to Tommy's treatment by his treating physicians. Bruce emailed the Hernando Police Department as early as July 13, 2012, pre-indictment, attaching a notice/demand letter from Ragsdale to one of the treating physicians. Ragsdale's letter set forth reasons for Tommy's appearance and injuries, contrary to those held by the treating physicians. Bruce further wrote that he would have an expert opinion from a radiologist, concluding that the injuries were not a result of abuse, within days, and it would be forwarded upon receipt. The record offers no indication that Bruce obtained or forwarded such an opinion(s). Isham and Mary Beth were indicted on August 15, 2012.[3]

¶47. Attorney Stacey Spriggs was appointed to represent Isham in September 2012. A joint motion for continuance for additional discovery was granted on January 4, 2013, resetting the trial date to June 24, 2013. A second continuance at Isham's instance was granted on June 11, 2013, to retain experts and conduct additional discovery. The trial was reset for October 28, 2013.

¶48. On July 10, 2013, Bill Bruce filed his entry of appearance to serve as additional counsel for Isham. That same day, Bruce filed Isham's separate Designation(s) of Expert Opinion, designating; Drs. Terry Moore and Franz Joseph Wippold.

---

[3]Mary Beth's charges were *nolle prossed* by the district attorney's office in May 2013.

¶ 49. The designations reveal the following:

A.

¶50. Dr. Moore, M.D., F.A.C.P., F.A.A.P., M.A.C.R., is a board-certified physician; professor of internal medicine, pediatrics, and molecular microbiology; and the immunology director, division of rheumatology and pediatric rheumatology at St. Louis University. Dr. Moore was expected to testify on ten topics, including but not limited to, his familiarity with the facilities available to the doctor treating Tommy; photographs and medical records of Tommy; numerous CT scans of Tommy; Systemic Lupus Erythematosus (SLE), diagnosis and treatment; CNS lupus, or CNS vasculitis; World Health Organization (WHO) criteria for diagnosing SLE; Antiphospholipid Antibody Syndrome; and tests for SLE/CNS vasculitis. The designation further reads that Dr. Moore was qualified to diagnose and treat SLE, CNS lupus, and CNS vasculitis. On May 29, 2013 (nearly one month before the second scheduled trial date of June 24, 2013) Dr. Moore reviewed the aforementioned, including Tommy's immunochemistry report and laboratory values. Dr. Moore opined that Tommy had sufficient criteria to diagnose SLE, however, the photographs indicate that it is likely Tommy had CNS vasculitis. Dr. Moore further opined that the Le Bonheur physicians' treatment fell below the recognized standard of care of acceptable practice on May 2, 2012, by discharging Tommy without further tests, and fell below the requisite standard by failing to treat Tommy for his condition. The designation attached Dr. Moore's Curriculum Vitae (CV) and noted that the review was not complete but would be supplemented when completed.

B.

¶51. Dr. Franz Whippold, II, M.D., was the chief of neuroradiology and a professor of radiology at the Mallinckrodt Institute of Radiology, Washington University School of Medicine in St. Louis, Missouri. He is a board-certified neuroradiologist. Dr. Whippold was expected to testify on twenty-one topics, including but not limited to, that he was familiar with the facilities and treatment available to the physicians treating Tommy; CT scans from April 30, 2012, May 1, 2012, May 12, 2012, and May 13, 2012; Tommy's skeletal survey reports; immunochemistry reports; lab reports; subdural hematoma aging; subarachnoid hemorrhage; antinuclear antibody testing; SLE diagnosis and treatment; WHO criteria for diagnosing SLE; the timing of subdural bleeding in Tommy; and accidental and nonaccidental trauma. On May 29, 2013, (the same date as Dr. Moore's review of the raw materials, nearly one month prior to the June trial date) Dr. Whippold reviewed the aforementioned, including photographs of Tommy, CT images, immunochemistry reports, skeletal survey reports, laboratory reports, and reference material. He opined that the April 30, 2012, and May 1, 2012, scans showed a normal brain with no bleeding and with soft-tissue swelling of the scalp consistent with lupus panniculitis ("LP"). He further opined that Tommy had seven of the eleven ACR criteria for diagnosing LP, and only four are required for diagnosis. Based on his review, Dr. Whippold opined that Tommy had SLE in April and May 2012. Lastly, he opined that Tommy's skeletal survey reports indicated no evidence of skeletal trauma to support a diagnosis of nonaccidental trauma, and that Tommy's symptoms were not caused by nonaccidental trauma. His opinion concluded that the bleeding shown on Tommy's CT scans on May 12, 2012, were the result of SLE combined with minor accidental

21

trauma occurring between May 8, 2012, and May 10, 2012. This designation likewise provided Dr. Whippold's curriculum vitae and stated that the review was not complete and that disclosure would be supplemented upon completion.

¶52. The trial court heard pretrial motions on October 7, 2013, to determine *inter alia* the expert testimony that would be allowed at trial. The State sought a motion to compel reciprocal discovery, stating that the defense had provided incomplete reports of Isham's experts. The State wanted either completed reports or a date certain when the reports would be finished. Defense counsel responded that he was "not aware of any further supplementation" from either expert. Defense counsel then stated:

> I believe that the appropriate thing at this point would be just to tell both sides that they're limited to what their experts have disclosed in written response; the *Defense gets to use the experts they've designated and the opinions that were disclosed in written discovery and that the State is limited to the same thing*.

(Emphasis added).

¶53. Defense counsel then said that Isham was going to request that the State assist in paying for "further involvement by both Dr. Whippold and Dr. Moore." The trial court stated that it would rule on the doctors' testimony when they were offered as witnesses. The October 7 hearing concluded with no *ore tenus* or written motion for funding or continuance, and without a request for issuance of out-of-state subpoenas for either expert.

¶54. On Thursday, October 17, the defense filed a motion for the state to pay for expert fees and for continuance, months after the experts had reviewed Tommy's medical records, photographs, images, etc., and months after they were designated as experts. The certificate

shows service on the State by regular mail. Unlike prior motions filed by defense counsel and the State alike, no notice for a hearing date is in the record.

¶55.    The trial court heard the motion on Tuesday, October 22, 2013, six days before trial. Isham presented arguments but no evidence. Neither of the opinions in the designations were argued, nor was either designation offered to the trial court in support of the motion. (*See supra* ¶ 48). The State presented testimony from Leigh Mercer, witness coordinator, who testified that she had contacted the doctors upon request from the district attorney. Both were unavailable for October 28. Both told Mercer that they did not know much about the case, and had spoken with "defense counsel" only once, months prior to her telephone call. Defense counsel's cross-examination of Mercer suggests strongly that neither doctor had spoken with Spriggs or Bruce, but rather with Ragsdale.

¶56.    The trial court denied the motion based on the lack of concrete reasons provided by the defense to support its arguments. The trial court also expressed concern for the timeliness of the motion. The trial court relied on ***Brandon v. State***, discussed *infra*. *See **Brandon***, 109 So. 3d 128. The trial cited ***Townsend v. State***, in applying the appropriate three-factor test for determining whether Isham was entitled to a state-funded expert. ***Townsend v. State***, 847 So. 2d 825, 828 (Miss. 2003) (citing ***Ake v. Oklahoma***, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985)). The trial court advised that Isham was required to demonstrate concrete reasons for needing a state-funded expert, citing ***McFadden v. State***, 929 So. 2d 365 (Miss. Ct. App. 2006), ***Ruffin v. State***, 447 So. 2d 113 (Miss. 1984), ***Green v. State***, 631 So. 2d 167 (Miss. 1994), and ***Hansen v. State***, 592 So. 2d 114 (Miss. 1991). The trial court noted that,

"[a]s a matter of fact, [it had] not been presented with any statements that these experts could even opine anything that would be beneficial to the defendant in this case." Defense counsel failed to offer and ask the trial court to consider Isham's designation, referred to *supra* (¶48, A-B), to demonstrate a concrete reason. Defense counsel further offered no alternative dates that the two experts would be available to testify.

Analysis

¶57.	In this appeal, the issue raised: trial-court error in refusing to provide Isham funds to hire an expert witness with regard to the nature of and cause of Tommy's injuries, otherwise could be stated as follows: Isham was denied the opportunity to present the testimony of two experts critical to his defense. However, as set forth *supra*, the experts already had been engaged, had responded regarding the nature of and cause of Tommy's injuries, already had reviewed extensive evidence related to causation, held opinions in direct contrast to the State's case, and had been designated to testify. The crux of the trial court's ruling was not funding, but rather, was counsel's failure timely and correctly to seek relief. Isham's plea was not only untimely, counsel failed to provide the trial court with concrete reasons for funding or to explain the experts' unavailability. Neither defense counsel requested subpoenas for either witness or sought funding for either expert, who had been designated more than three-and-a-half months prior to trial.

¶58.	Based on the preceding facts, it would be a manifest miscarriage of justice for this Court not to apply the plain-error doctrine, for an ineffective-assistance-of-counsel claim is

fully developed in the record before us, unlike that found by the **Brandon** court. *See* **Brandon**, 109 So. 3d 128.

¶59. "For the plain-error doctrine to apply, there must have been an error that resulted in a manifest miscarriage of justice or 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" **Conners v. State**, 92 So. 3d 676, 682 (Miss. 2012) (quoting **Brown v. State**, 995 So. 2d 698 (Miss. 2008) (quoting **United States v. Atkinson**, 297 U.S. 157, 160, 56 S. Ct. 391, 80 L. Ed. 555 (1936))). Under the plain-error doctrine, this Court may *sua sponte* raise issues not properly raised by the defendant when defendant's right to a fair trial has been violated. *See* **Conners**, 92 So. 3d at 682 (citing **Smith v. State**, 986 So. 2d 290, 294 (Miss. 2008) (quoting **Debrow v. State**, 972 So. 2d 550, 553 (Miss. 2007))). It is the duty of the defendant and counsel to review the record carefully and then to seek relief accordingly. That did not occur here.

> The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. **Strickland v. Washington**, 466 U.S. 668, 686, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674 (1984). The test is two pronged: The defendant must demonstrate that his counsel's performance was deficient, and that the deficiency prejudiced the defense of the case. **Strickland**, 466 U.S. at 687, 104 S. Ct. at 2064; **Washington v. State**, 620 So. 2d 966 (Miss.1993). This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

**Havard v. State**, 86 So. 3d 896, 903-04 (Miss. 2012) (citations omitted).

¶60. Ineffective-assistance-of-counsel determinations are decided on a case-by-case basis. **Williams v. Taylor**, 529 U.S. 362, 391, 120 S. Ct. 1495, L. Ed. 2d 389 (2000) (citation

25

omitted). Funding, *vel non*, also must be determined on a case-by-case basis. ***Lowe v. State***, 127 So. 3d 178, 181 (Miss. 2013). Thus, both issues require fact-specific scrutiny.

¶61.    There must exist a "reasonable probability" that, without counsel's errors, a different result would have been reached.  ***Williams,*** 529 U.S. at 391 (quoting ***Strickland***, 466 U.S. at 694). Also, there must be "A reasonable probability that at least one juror would have struck a different balance." ***Davis v. State***, 87 So. 3d 465, 474 (Miss. 2012) (citing ***Wiggins v. Smith***, 539 U.S. 510, 537, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)).

¶62.    In ***Davis v. State***, this Court held counsel ineffective for failing to contact and interview key defense witnesses where the record was certain that counsel's actions were not tactical. ***Davis***, 87 So. 3d at 469. This Court instructed that an in-depth analysis is not required to reach the conclusion that " . . . an attorney who never seeks out or interviews important witnesses . . . was not engaging in trial strategy." ***Davis***, 87 So. 3d at 469. In ***Johns v. State***, this Court similarly provided "[t]he decision not to interview witnesses, particularly your own, cannot be considered an effective choice. When counsel makes choices of which witnesses to use or not to use, those choices must be based on counsel's proper investigation." ***Johns v. State***, 926 So. 2d 188, 196 (Miss. 2006). Although "[t]he line between effective and ineffective assistance of counsel is not always clear[,]" it is clear in today's case. *See **Davis***, 87 So. 3d at 470.

¶63.    Here, counsel's failure to contact the witnesses, secure their presence for trial, request subpoenas, request funding, or timely request a continuance cannot be deemed tactical. As mentioned *supra*, Isham had two expert witnesses to refute the State's case, albeit experts

and opinions that were obtained through the efforts of others. These were two expert witnesses who already had been interviewed and had been provided materials and had rendered opinions. The record is void of any evidence exhibiting that either of Isham's counsel talked to the experts, confirming their opinions and determining their availability to testify the week of October 28-30. The record offers clear evidence to the contrary, for the experts had not been informed of the trial date, no subpoenas were requested or issued, and no funds had been requested to secure their presence until the eve of trial. The only evidence provided to the trial court regarding experts' fees and availability was produced by the State's witness coordinator, not Isham's counsel.

¶64. Isham likens this case to *Lowe v. State*; however, the facts before us are entirely dissimilar. *Lowe*, 127 So. 3d 178. In *Lowe*, a defense expert was needed to "refute the State expert's allegations[,]" and to enable Lowe to question the State's expert effectively. *Lowe*, 127 So. 3d at 183. Further, the State's expert provided the sole testimony connecting Lowe to the crime. *Id*. We concluded that Lowe was denied the opportunity adequately to prepare his defense. *Id*. at 184.

¶65. Although not relied on by Isham, the majority also cites *Brown v. State*. *Brown v. State*, 152 So. 3d 1146 (Miss. 2014). However, *Brown* is distinguishable. In *Brown*, the trial court failed to conduct an indigency hearing before denying Brown's timely request for funding, which had been filed nearly two years before trial, ruling it had no authority to allow funds for a defendant who had not been found indigent. *Brown*, 152 So. 3d at 1165. Additionally, Brown was granted a new trial for unsupported limitations on cross-

27

examination of both testifying doctors. *Id*. at 1169. Here, it is undisputed that Isham was indigent, that he had experts who had reviewed the "raw material" and were willing to refute evidence, and that he had filed a request for funding/continuance. Isham also was allowed and conducted a liberal cross-examination of the State's witnesses. Therefore, Isham's factual scenario is markedly distinguishable from the facts in ***Brown***.

¶66.    In the case *sub judice*, Isham already had identified witnesses, who had been furnished "raw materials" (medical records, tests, photos, etc.), who already had formulated opinions "to refute" the treating physicians, combined with Ragsdale's point-by-point outline for effective cross-examination of the treating physicians. Isham had not one, but two, experts prepared to refute the experts that the State was calling. Lowe and Brown had no one. Defense counsel's cross-examination of the medical experts on Tommy's medical records, reports, tests, and peer-reviewed publications and treatises, demonstrates that he was well-qualified to examine Tommy's treating physicians. Lowe and Brown were not similarly prepared. Isham's disadvantages arose because defense counsel had failed to arrange for Isham's experts to appear at trial and testify, not because of trial-court error.

¶67.    On appeal, Isham argues unconvincingly that he was denied the opportunity to consult with the doctors identified in his designation and therefore to prepare and present his defense. The record is devoid of evidence to support such an argument. The record actually belies this argument. The record confirms that Isham possessed the "raw materials" needed for his defense. His counsel had an outline of the specific failures of the treating physicians, and defense counsel possessed opinions from both Drs. Moore and Whippold, who already had

28

reviewed Tommy's medical records, photos, etc. All Isham lacked was their presence at trial (best achieved by agreement or a subpoena). The record does not reveal any attempt by defense counsel to secure their attendance. As late as October 7, defense counsel told the trial court that both experts would testify at trial, but at that time or before, defense counsel failed to request funds or subpoenas. Further, as mentioned *supra*, defense counsel's cross-examination of the witness coordinator on October 22 indicates that neither of Isham's trial counsel actually had spoken with these experts. These facts clearly distinguish the dilemma facing Lowe and Brown. *Lowe*, 127 So. 3d 178; *Brown*, 152 So. 3d 1146.

¶68.    Some of the critical facts identified in today's case can be found in *Brandon v. State*, yet it also has its clear distinctions. *Brandon*, 109 So. 3d 128. In *Brandon*, the defendant's counsel filed a motion for expert funds in July 2008 but did not request a hearing on the motion until thirteen months later, the Friday before trial was to begin on Monday. *Brandon*, 109 So. 3d at 132. Similarly, Brandon was denied funding for an expert witness because he failed to provide concrete reasons for needing the expert. *Id*. The Court of Appeals found that Brandon's motion was properly denied due to the "actions and inactions" of his counsel, "not the circuit judge's denial of his last-minute request[,]" finding that the trial judge did not abuse his discretion, and any relief should be pursued under an ineffective-assistance-of-counsel claim, which could be developed fully in his motion for post-conviction relief. *Id*. at 130. The overriding distinction is that the record in today's case requires no further development of facts.

¶69.	In the case *sub judice*, the trial court ruled that it would not grant Isham state funding to hire the aforementioned experts because the defense had failed to provide concrete reasons to support its argument and because of the untimeliness of the motion. The record supports both rulings and evidences no abuse of discretion. The trial court stated its concern over defense counsel's failure to bring this issue for hearing sooner. The trial court expressed its concern over granting another lengthy continuance, and further that the court had not been provided alternative dates when the experts would be available. The trial court stated it had yet to be presented with any statements from the experts, *i.e.*, a concrete reason for continuance. "The decision to grant or deny a motion for a continuance is within the sound discretion of the trial court and will not be grounds for reversal unless shown to have resulted in manifest injustice." *See* **Simmons v. State**, 805 So. 2d 452, 484 (Miss. 2001) (citations omitted).

¶70.	Based on the extraordinary facts of this case and the failure of Isham's counsel to undertake the steps necessary to put before the jury testimony refuting the State's causation theory, we conclude that a reasonable probability exists for a different outcome. Assuredly, a fair trial was not had, but not because of trial-court error. I agree that this case should be reversed and remanded for proceedings consistent with this opinion.

**CHANDLER AND PIERCE, JJ., JOIN THIS OPINION.**